Daniel C. Girard (State Bar No. 114826)
Jordan Elias (State Bar No. 228731)
Adam E. Polk (State Bar No. 273000)
Trevor T. Tan (State Bar No. 281045)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Tel: (415) 981-4800
*dgirard@girardsharp.com*
*jelias@girardsharp.com*
*apolk@girardsharp.com*
*ttan@girardsharp.com*

Benjamin F. Johns (*pro hac vice*)
Andrew W. Ferich (*pro hac vice*)
Zachary P. Beatty (*pro hac vice*)
Beena M. McDonald (*pro hac vice*)
**CHIMICLES SCHWARTZ KRINER**
**& DONALDSON-SMITH LLP**
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Fax: (610) 649-3633
*bfj@chimicles.com*
*awf@chimicles.com*
*zpb@chimicles.com*
*Interim Class Counsel*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE NEXUS 6P PRODUCTS LIABILITY LITIGATION | Case No. 5:17-cv-02185-BLF |
| | **JOINT DECLARATION OF DANIEL C. GIRARD AND BENJAMIN F. JOHNS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT** |
| | Date: May 2, 2019 Time: 1:30 p.m. Courtroom: 3, 5th Floor Judge: Hon. Beth Labson Freeman |

We, Daniel C. Girard and Benjamin F. Johns, declare as follows pursuant to 28 U.S.C. § 1746:

1.      Daniel C. Girard is the founder and managing partner of Girard Sharp LLP ("Girard Sharp") and one of the attorneys of record for Plaintiffs.[1] Mr. Girard submits this declaration in support of Plaintiffs' motion for preliminary approval of a class action settlement with Defendants. Mr. Girard makes this declaration based on his own personal knowledge, and if called to do so, could testify to the matters contained herein.

2.      Benjamin F. Johns is a partner in the law firm of Chimicles Schwartz Kriner & Donaldson-Smith LLP ("Chimicles") and one of the attorneys of record for Plaintiffs.  Mr. Johns submits this declaration in support of Plaintiffs' motion for preliminary approval of a class action settlement with Defendants. Mr. Johns makes this declaration based on his own personal knowledge, and if called to do so, could testify to the matters contained herein.

## I.      THE LITIGATION AND SETTLEMENT NEGOTIATIONS

3.      This action is a proposed nationwide consumer class action against Huawei Device, USA, Inc. and Google LLC. Plaintiffs allege Huawei and Google jointly developed, produced and sold the Nexus 6P smartphone. Plaintiffs allege that the Nexus 6P experienced inordinately high rates of failure, with many consumers reporting that the phones become inoperable due to "bootloop" (when a Nexus 6P allegedly begins randomly rebooting, and in some instances fails permanently in an endless bootloop cycle, where the phone constantly reboots without ever advancing to the home screen, and in some instances, may stop booting altogether) or "battery drain" (when a Nexus 6P allegedly has a noticeable decrease in battery life, or shuts off suddenly even when its battery life icon shows that it is charged) issues.

4.      In April 2017, Girard Sharp and Chimicles filed separate class action in the Northern District of California. Both alleged consumer fraud and breach of warranty arising out of the Nexus 6P's alleged battery drain and bootloop issues. Chimicles filed a third case in the Eastern District of Texas on April 14, 2017, but voluntarily dismissed the action without prejudice on May 8. Notice of Voluntary Dismissal, *Gorbatchev v. Huawei Tech., et al.*, No. 4:17-cv-00260-ALM (E.D. Tex. May 8,

---

[1]Unless otherwise noted, capitalized terms have the meaning ascribed to them in the Settlement Agreement.

2017), ECF 12. On May 10, 2017 this Court consolidated the two Northern District of California cases (ECF 19) as *In re Nexus 6P Products Liability Litigation*, and on June 7, 2017, this Court appointed Girard Sharp and Chimicles as interim co-lead counsel (ECF 34).

5.    Plaintiffs then filed a Consolidated Amended Complaint asserting warranty, unfair competition, unfair business practices, and consumer fraud counts on behalf of a nationwide class and several subclasses on May 23. ECF No. 28. Defendants filed separate motions to dismiss the CAC and to strike the class allegations. ECF Nos. 38-39. Huawei also moved to dismiss Plaintiffs' claims based on lack of personal jurisdiction. ECF 38 at 6-8. Plaintiffs opposed Defendants' Motions to Dismiss on July 28, and Defendants filed replies on August 7. ECF Nos. 53, 60-61.

6.    Defendants followed their dismissal motions with a joint motion to stay discovery, filed June 30. ECF 41. Plaintiffs opposed the motion (ECF 46) and Defendants replied (ECF 47). The Court heard oral argument and granted Defendants' request for a stay pending resolution of the motions to dismiss on August 18, 2017. ECF 84.

7.    The parties appeared for the initial case management conference on August 31. Before the conference, Plaintiffs prepared and served early document requests under FED. R. CIV. P. 26(d)(2), conducted a Rule 26(f) conference, and exchanged drafts of a stipulated protective order and a protocol for the discovery of electronically stored information. ECF No. 86 at 8-9. Also before the conference, in accordance with the local rules, the parties submitted a stipulation agreeing to participate in private mediation by mid-December 2017. The Court entered the parties' ADR stipulation on August 10, 2017. ECF 81.

8.    In view of the parties' agreement to participate in mediation by December, the parties sought by stipulation to postpone the hearing date on Defendants' motions to dismiss the CAC from November 16, 2017 to January 18, 2018. The Court granted the parties' stipulated request. ECF 95.

9.    The parties appeared for mediation before Hon. Layn R. Phillips (Ret.) on December 5, 2017. In advance of the mediation, the parties exchanged briefs providing their assessment of the respective claims and defenses at issue. Defendants also provided information about Nexus 6P sales and the scope and scale of the alleged defect. The parties' mediation session was unsuccessful, due in

part to unresolved issues surrounding Huawei's personal jurisdiction challenge, the then-pending motions to dismiss, and the ongoing discovery stay.

10.     The Court heard oral argument on Defendants' motions to dismiss the CAC on January 18, 2018. Following the hearing, the Court issued an order continuing the stay of discovery "until further notice from this Court in its Order on Defendants' motions to dismiss." ECF No. 106. The Court granted Huawei's motion to dismiss for lack of personal jurisdiction without prejudice, and afforded Plaintiffs an opportunity to take jurisdictional discovery on February 12. ECF No. 113. On March 5, the Court issued an 88-page opinion granting in part and denying in part Defendants' motions to dismiss. No. ECF 115.  The Court ruled that "Plaintiffs have not adequately alleged that Huawei or Google had knowledge of the defects at the time that Plaintiffs purchased their phones." *Id.* at 9. The Court also denied Defendants' motion to strike the class allegations from the complaint "without prejudice to raising the arguments presented in those motions at a later stage of the proceedings." *Id.* at 85.

11.     Following the Court's order on Huawei's personal jurisdiction motion, Plaintiffs and Huawei negotiated and filed with the Court competing jurisdictional discovery plans.  The Court considered both parties' submissions and issued an order on March 7. ECF Nos. 114, 116. Huawei ultimately withdrew its challenge to personal jurisdiction. ECF No. 125.

12.     On May 10, Plaintiffs filed their Second Amended Complaint ("SAC"), asserting the following claims: (1) breach of express warranty; (2) breach of the implied warranty of merchantability; (3) violation of the Magnusson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*.; (4) violation of the Song-Beverly Consumer Warranty Act, CAL. CIV. CODE § 1792 *et seq*.; (v) violation of the California Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200 *et seq*.; (vi) violation of California's Consumers Legal Remedies Act, CAL. CIV. CODE § 1750 *et seq*.; and (vii) fraudulent concealment (common law). ECF No. 117.

13.     The parties appeared before the Court for a second case management conference on June 7. At the conference, the parties addressed the propriety of the ongoing discovery stay, Plaintiffs' intent to seek relief from the stay, Defendants' forthcoming motions to dismiss the SAC, and a schedule for the remainder of the case. On June 11, Plaintiffs filed a motion to lift the discovery stay. ECF No. 133. Defendants responded on June 15, Plaintiffs replied on June 18, and the Court granted Plaintiffs'

motion to lift the discovery stay on June 19. ECF Nos. 138-39, 144. Also on June 19, the Court entered the parties' protective order, protocol for the production of electronically stored information, and entered a schedule for the remainder of the case. ECF Nos. 140-41, 145.

14.     The parties began discovery following the Court's July 19 orders, serving and responding to document requests, interrogatories, and requests for admissions. Plaintiffs' counsel obtained, reviewed, and analyzed hundreds of documents from Defendants and non-parties showing Nexus 6P advertising, product packaging, sales figures, customer service policies and procedures, consumer complaints, and technical information.

15.     In late June and early July, Plaintiffs also served subpoenas on 12 non-parties— including uBreakiFix (a company that offers phone repair services), and the issuer of insurance policies for the Nexus 6P (Assurant Inc.). Six of the subpoenaed parties are cellular carriers. The remaining four are Nexus 6P resellers. Plaintiffs' subpoenas sought information relating to Nexus 6P consumer complaints, repairs, insurance claims, and sales volume. Over the course of several months Plaintiffs' counsel negotiated with subpoenaed non-parties over compliance and reviewed the responsive productions.

16.     Huawei and Google each served discovery requests directed to the Plaintiffs. Plaintiffs responded and objected to these requests, and produced several hundred pages of responsive documents.

17.     On September 6, counsel for Google advised Plaintiffs that they intended to take the depositions of two former class representatives who were not named as Plaintiffs on the SAC, and who had voluntarily dismissed their claims.  After negotiations, the depositions were completed in Chicago and Ann Arbor, Michigan. Plaintiffs' counsel prepared each of these witnesses extensively, and defended their depositions.

18.     Over the course of the litigation Plaintiffs also retained and consulted with experts on the manufacture of electronic products and on damages. Plaintiffs retained two experts on the alleged "battery drain" issue, one expert on the alleged "bootloop" issue, and a nationally credentialed economist to serve as a damages expert. One of these experts drafted a 13-page preliminary report

JOINT DECLARATION ISO OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL
CASE NO. 5:17-cv-02185-BLF

which identified some of the issues and causes of the alleged issues. Plaintiffs' counsel purchased several sample Nexus 6P phones and provided them to the technical experts for testing.

19.     On June 14, Huawei and Google moved to dismiss the SAC, along with the class action allegations. ECF Nos. 134, 135. Plaintiffs opposed those motions on July 19 (ECF Nos. 148, 149) and Defendants filed reply briefs on August 2 (ECF Nos. 154, 155). The Court heard argument on those motions on October 17. ECF No. 164. At the hearing, the Court inquired as to the progress the parties had made in attempting to settle the case, and encouraged the parties to continue their discussions.

20.     The parties resumed settlement negotiations following the October 17 hearing. After weeks of negotiations, the parties reached an agreement in principle to resolve the case on November 27. Pursuant to a stipulated request of the parties, the Court suspended existing case deadlines on November 29 (ECF No. 177) and held a further case management conference on January 16, 2019 (ECF No. 182).

21.     After several months negotiating and documenting the settlement, including the Plan of Allocation incorporated into the Settlement Agreement, the parties signed the Settlement Agreement attached hereto as **Exhibit A**. The parties' Supplemental Settlement Agreement, which specifies the conditions under which Defendants may elect to terminate the Settlement Agreement, is attached hereto as **Exhibit B**.

## II.     THE SETTLEMENT

### A.     The Settlement Amount

22.     Defendants will pay $9,750,000 on a non-reversionary basis in settlement of all claims that were alleged or could have been alleged in the case.  Notice and administrative expenses will be deducted from the settlement amount, as will any attorneys' fees and expense reimbursements approved by the Court.  The balance will be devoted to pay claims of class members. Plaintiffs will seek up to 30% of the fund in attorneys' fees and up to $200,000 in reimbursement of expenses and service awards to the class representatives. Notice and administration expenses are not expected to exceed $250,000. If these deductions are allowed in full, the settlement will generate approximately $6,375,000 to pay class member claims. The parties propose to donate any residual to the National

Consumer Law Center ("NCLC").  Counsel and the Parties do not derive a direct or indirect benefit from the selection of NCLC as the recipient of a charitable contribution.

23.     Plaintiffs believe the $9,750,000 settlement is a favorable result in relation to the potential aggregate recoverable damages, had they obtained class certification and prevailed on their claims at trial.  The information available, as developed through discovery, indicates approximately 500,000 Nexus 6P smartphones were sold during the relevant time period. The Nexus 6Ps were sold at prices of $500 to $650 depending on the model. The information available, as developed through discovery, indicates approximately 100,000 reports from consumers generally correlated to the issues alleged in the litigation, including multiple contacts from the same individual.  (Defendants believe that this figure may be over-inclusive and under-inclusive due to variations in how customer contacts were coded in Defendants' records).   The information available, as developed through discovery, also indicated approximately 50,000 to 80,000 smartphones were replaced with Nexus 6Ps or Pixel XLs—Google's then-latest-generation, state of the art smartphone—through warranty adjustments or third party insurer Assurant.  Plaintiffs believe there are fewer than 40,000 phones (and more likely 20,000 to 30,000) that were the subject of reports and have not been replaced through one form of adjustment or another.  The cost to replace 40,000 phones at $500 per unit would be $20 million.  But a full $500 per phone recovery is unlikely given the need to discount the recovery for the period of use enjoyed by the consumer prior to any performance issue manifesting.

24.     Class Counsel purchased several new Nexus 6Ps for their experts to test after they had filed the lawsuit, which had received coverage in the technical press. E.g., David Kravets, Another Android Flagship, the Nexus 6P, Ends up in a Class-Action Lawsuit, ARS Techica, April 20, 2017 (available at https://arstechnica.com/tech-policy/2017/04/another-android-flagship-the-nexus-6p-hit-with-class-action-lawsuit/).  Class Counsel noted evidence that the purchase price following the filing of the lawsuit and publication of the alleged defects was at least 12% lower than the original purchase price. E.g., https://web.archive.org/web/20180301174051/https://www.walmart.com/ip/Total-Wireless-Google-Nexus-6P-32GB-Prepaid-Smartphone-Silver/55091210.

25.     Assuming a similar 12% "price inflation" measure applied to approximately 500,000 Nexus 6Ps at an across the board price of $500, damages would fall in the range of $30 million.   A

settlement of $9,750,000 therefore represents a recovery of 32.5% of recoverable damages.  Plaintiffs' estimate assumes the Court rules in favor of Plaintiffs on class certification, Plaintiffs prevail on every claim and the Court accepts a price premium model and awards damages on an aggregate basis.  If Plaintiffs prevailed at trial but the Court required any form of individualized damage prove up, with class members having to come forward to establish whether or not they ultimately suffered any damage depending on whether they experienced the alleged issues in or out of warranty, and whether Defendants warranty adjustments made the class member whole, Class Counsel believe a victory at trial would likely prove pyrrhic. In contrast, the claims procedure made available under the Settlement offers substantial recoveries to consumers who make the minimal effort needed to submit a claim.

### B.   The Settlement Class

26.     The Settlement Class consists of all persons in the United States who purchased a Nexus 6P smartphone, other than for resale, between September 29, 2015 and the date the Court grants Preliminary Approval of this Settlement. Excluded from the Settlement Class are (a) Huawei and Google, and their officers, directors, employees, subsidiaries, and Affiliates; (b) all judges assigned to this case and any members of their immediate families; and (c) the parties' counsel in this litigation. The only difference between the Settlement Class and the class pleaded in the Second Amended complaint is that the parties have agreed to fix preliminary approval as the end date, whereas the Second Amended Complaint defines the class period as September 29, 2015 through "the present." ECF 117 at ¶ 141.

### C.   The Plan of Allocation

27.     Exhibit 1 to the Settlement Agreement sets forth the Plan of Allocation.  In developing the Plan of Allocation, counsel for the parties were required to contend with a lack of comprehensive records indicating which Nexus 6P purchasers experienced the alleged bootloop and battery drain issues, whether those alleged issues were addressed through delivery of a fully operational replacement device, whether the purchaser experienced a subsequent alleged issue on the replacement device, and whether that alleged issue in turn was addressed to the purchaser's satisfaction. The most detailed records were obtained by Class Counsel from Assurant—an insurance provider for Nexus 6Ps sold by Google—showing which Settlement Class Members purchased insurance and subsequently made

claims correlated with the alleged bootloop and battery drain conditions. The information obtained from Assurant will be used to repay deductibles paid by Settlement Class Members who made insurance claims, as set forth below.

28.     In developing the Plan of Allocation and claims process, Class Counsel also sought to balance the imperatives to make the settlement accessible and ensure ease of administration, the degree of harm suffered, whether the harm was addressed through a replacement, and the need to deter fraudulent or overstated claims. In light of the lack of comprehensive records and in order to allocate the fund equitably, verify eligibility, address information, and payment preferences, all class members will be asked to complete a simple claim form Class Counsel developed in consultation with the Settlement Administrator. A copy of the proposed Claim Form is attached hereto as **Exhibit C**.

29.     The Claim Form will require each Claimant to confirm his or her current contact information (to the extent practicable, the Claimant's name and email address will be prepopulated) and certify that he or she is in the United States and purchased a Nexus 6P other than for resale. The Claim Form will make clear that a claimant need not have experienced an alleged bootloop or battery drain issue to be eligible for payment.

30.     Claimants who experienced alleged bootloop or battery drain, moreover, do not have to submit documentation in order to recover, but need only certify under oath that they experienced one or both issues. Claimants who experienced one or both issues are invited to submit supporting documentation, such as photographs, screenshots, emails, customer service chat logs, repair records, insurance claims, or Return Merchandise Authorization confirmations, and those who do may receive a substantially greater recovery.

31.     The Settlement Administrator will divide claimants into the following groups:

●     Group 1 includes class members who did not experience an alleged bootloop or battery drain, who did not submit supporting documentation of alleged bootloop or battery drain, or who received a Pixel XL smartphone from Google as a replacement for their Nexus 6P.  Within this group, claimants who purchased a Nexus 6P that did not experience an

alleged bootloop or battery drain issue will receive a minimum payment of $5 and a maximum payment of $10 ("Group 1A"). Claimants who purchased a Nexus 6P that they attest experienced an alleged

JOINT DECLARATION ISO OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL
CASE NO. 5:17-cv-02185-BLF

battery drain issue, but who did not submit valid supporting documentation, will receive a minimum payment of $10 and a maximum payment of $45 ("Group 1B").   Claimants who purchased a Nexus 6P that they attest experienced an alleged bootloop, but who did not submit valid supporting documentation, will receive a minimum payment of $20 and a maximum payment of $75 ("Group 1C").

- Group 2 includes class members who experienced an alleged documented bootloop or battery drain. Claimants who purchased a Nexus 6P that they attest experienced alleged battery drain, and who submitted valid supporting documentation, will receive a payment of $150 ("Group 2A"). Claimants who purchased a Nexus 6P that they attest experienced alleged bootloop, and who submitted valid supporting documentation, will receive a payment of $325 ("Group 2B").

- Group 3 includes class members who submit evidence of multiple alleged bootloop or battery drain. These claimants will receive a payment of $400 ("Group 3").

32.     In allocating the Net Settlement Fund, an amount sufficient to pay each Group 1A claimant $5, each Group 1B claimant $10, and each Group 1C claimant $20, will first be set aside and reserved to make those payments. The balance of the fund will then be allocated among all Group 2A, Group 2B, and Group 3 Claimants according to the payment structure summarized above.  If the fund is insufficient to pay all Group 2A, Group 2B, and Group 3 claimants according to this payment structure, the amounts allocated to these claimants will be proportionally reduced, so as to exhaust the fund, according to the ratio of the respective payments for each of these groups stated above.

33.     If settlement funds remain after the Settlement Administrator processes all valid claims, the balance of the Net Settlement Fund will then be applied to repay the insurance deductibles paid to Assurant by class members in Groups 1B, 1C, 2A, 2B, or 3 for claims for Nexus 6Ps that allegedly experienced a bootloop or battery drain. To determine which claimants qualify for such payments, the Settlement Administrator will use records that Assurant will provide on a confidential basis. If the Net Settlement Fund is insufficient to reimburse the sum of the insurance deductibles these claimants paid, each will receive a payment, proportionally reduced based on the actual insurance deductible that each paid, so as to exhaust the fund. If excess settlement funds remain in the Net Settlement Fund, the

balance of the Net Settlement Fund will be distributed, *pro rata*, to those claimants who submitted valid claims but did not submit evidence in support of their claims, up to the respective maximum payments under Sections III.B.1.a, III.B.1.b, and III.B.1.c. of the Plan of Allocation. If additional funds would still remain at that point, Class Counsel will notify the Court and propose a reasonable alternative or alternatives for distribution of the remaining funds, subject to the approval of Defendants.

34.    In the event that the residual funds are distributed to *cy pres*, they will be distributed to the National Consumer Law Center. Plaintiffs selected the National Consumer Law Center based on the NCLC's close relation to the subject matter of this case and because other courts in this district have recently approved settlements awarding *cy pres* funds to it. The NCLC is a non-profit consumer advocacy organization that advocates on behalf of consumers, provides legal services and aid, and represents consumers on matters of interest before Congress and state legislatures and by filing amicus briefs in courts across the country. Counsel and the Parties do not derive a direct or indirect benefit from the selection of NCLC as the recipient of a charitable contribution.  Courts in this district have approved distribution of class action remainders to NCLC in analogous consumer class action settlements. *See McKnight v. Uber Techs., Inc.*, No. 14-cv-05615-JST, 2017 U.S. Dist. LEXIS 124534, at *17-18 (N.D. Cal. Aug. 7, 2017) (quoting *Miller v. Ghirardelli Chocolate Co.*, No. 12-CV-04936-LB, 2015 U.S. Dist. LEXIS 20725, at *8 (N.D. Cal. Feb. 20, 2015)) ("Numerous courts, including this one, have previously approved *cy pres* awards to NCLC in consumer class actions…"). The parties agree that NCLC's consumer advocacy work is reasonably related to the consumer protection claims advanced here.  Plaintiffs' counsel have confirmed with NCLC directly that any remainder distributed to NCLC will be used in furtherance of NCLC's consumer-oriented objectives. A copy of the Declaration of Paul H. Laurent, the Director of Leadership Giving & Engagement at NCLC is attached hereto as **Exhibit D**. No settlement funds will revert to Defendants under any circumstances.

35.    The parties considered various approaches to paying claimants without a claim procedure.  For several reasons, the parties agreed making payments without verification and input from class members was not practicable in this case.  Due to variations in how customer contacts were coded in Defendants' records, it is difficult to precisely match consumer contacts and the defects alleged in the case, including which consumers received a replacement phone or refund as a result of a

claim correlated with the alleged defects.  Direct payment would have also prevented the parties from distributing funds through an electronic payment system, requiring the issuance of thousands of checks without verifying the identity, contact information or payment preference of the claimant.  Direct payment without a claims process would have resulted in higher administrative costs as a result of checks being sent to incorrect addresses, checks made with incorrect payee names, and checks to people who, due to inaccurate or incomplete data, are not Settlement Class Members. The notice program will allow the Settlement Administrator to collect up-to-date information for every Settlement Class Member who files a claim.

36.    In light of the considerations above, and in consultation with the proposed Settlement Administrator, Kurtzman Carson Consultants, LLC ("KCC"), Class Counsel believe that the Plan of Allocation and notice program are an effective means of informing the Settlement Class of the settlement and distributing settlement funds.

## III.    NOTICE AND SETTLEMENT ADMINISTRATION

37.    Plaintiffs have proposed forms of notice and a notice program that comport with due process, Federal Rule of Civil Procedure 23, and the Northern District's Procedural Guidance for Class Action Settlements. The settlement provides for direct, individual notice to Settlement Class Members via email and U.S. mail. Class member contact information has been gathered from Defendants' records and the records of subpoenaed non-party retailers and will be provided to the Settlement Administrator within 10 business days after preliminary approval. Class Counsel have conferred with counsel for Defendants and non-parties and believe that email and/or physical addresses (or both) exist for substantially all of the Settlement Class Members.

38.    For persons whose contact information was obtained from Defendants or nonparty retailers, notice will be sent via email. For those email notices that bounce back (or for those for which a physical address—but not an email address—is available), the Settlement Administrator will mail Supplemental Postcard Notice.

39.    Plaintiffs' proposed long-form notice (which will be available on the settlement website), email notice and supplemental postcard notice are attached hereto as **Exhibits E, F, and G**.

40.     Class Counsel will also issue a press release providing Notice of the Settlement, a link to the Settlement Website and contact information for the Settlement Administrator. In the event that KCC determines that less than 70% of the Settlement Class receive notice through individual notice efforts, KCC will implement a digital notice campaign, consisting of digital advertisements on a digital advertising network to be jointly agreed upon by the parties. If supplemental notice is required, KCC will ensure a net combined direct notice and digital reach of at least 70%. A comprehensive explanation of the notice plan appears in the Declaration of Carla Peak, of KCC, which is attached hereto as **Exhibit H**.

41.     The proposed notices advise class members of the pendency of the action, including the nature of the action and a summary of the claims; the essential terms of the settlement; the rights of class members to share in the recovery or to request exclusion from the Class; the rights of class members to object to the Settlement and to appear before the Court at the Final Fairness Hearing; and will provide the date, time, and place of the Final Fairness Hearing. The notices also contain information regarding Class Counsel's anticipated fee and expense application, the Service Awards, and the Plan of Allocation.

42.     Plaintiffs propose that KCC be appointed as Settlement Administrator. KCC was selected by Class Counsel through a neutral and competitive bidding process among five well-established class action settlement administration firms. KCC was the low bidder and Class Counsel believe from experience that is KCC is otherwise qualified to perform all of the settlement administration tasks contemplated by the Settlement Agreement. KCC, on behalf of the Defendants, will also be providing notice of the settlement to the appropriate federal and state authorities pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715.

43.     The estimated cost of notice and administration is $250,000, which Class Counsel believe is reasonable because the direct notice campaign contemplates supplemental postcard notice (with associated postal costs) to thousands of Settlement Class Members, supplemental digital notice, and processing and auditing of claims. In class counsel's experience, the cost of notice and settlement administration here—approximately 2.5% of the settlement fund—is consistent with or below the average in similar cases.

44. Class Counsel expect between 5% and 20% of Settlement Class Members to submit claims. A table including the information concerning analogous settlements and past work with the Settlement Administrator specified in the Procedural Guidance for Class Action Settlements is attached hereto as **Exhibit I**.

45. Class Counsel anticipate applying an award of attorneys' fees of up to 30% of the Settlement Fund or $2,925,000, plus reimbursement of expenses not to exceed $200,000, and for Service Awards in the amount of $3,000 for each of the thirteen Class Representatives. Class Counsel's current combined lodestar is approximately $3.5 million, representing 6,694 hours of work on this case. The corresponding multiplier if the Court awards a fee of 30 percent of the fund is .83, a negative multiplier.  The Service Awards are intended to compensate the class representatives for assisting counsel in preparing the complaint, communicating with Plaintiffs' counsel about case developments, and answering Defendants' interrogatories and responding to their requests for production, and gathering and producing documents.

46. All of the work performed by Plaintiffs' counsel had been done on a contingency-fee basis, and neither of our firms have been reimbursed for the billable time or out of pockets costs advanced to prosecute this case.

47. If the Court approves the settlement, the parties will request that the Court enter the Final Order and Judgment, releasing all claims that were or could have been asserted against Defendants in this litigation. The proposed Order Granting Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and Providing for Notice, and the proposed Final Order and Judgment are attached hereto as **Exhibits J and K**.

## IV.     RECOMMENDATION OF COUNSEL

48. Girard Sharp and Chimicles each have considerable experience in class action litigation, including the prosecution and resolution of consumer class actions. Our respective law firm resumes are attached as **Exhibits L and M**.  In negotiating this settlement, we have considered the relative risks and benefits of settlement in relation to the risks of litigation.  We have also negotiated this settlement to comply in all respects with the relevant case law and this District's Guidance for Class Action Settlements. We believe that considering the relative benefits of settlement at this time on the terms

offered, in comparison to the risk of a less favorable outcome, taking into account the considerable risk, expense and delay attendant upon obtaining an order certifying a multi-state consumer class action such as this one for trial, and the prospects of prevailing at trial and on appeal, the proposed settlement meets the standard for preliminary approval under Rule 23 in that the Court "will likely be able to" approve the settlement as fair, reasonable adequate under Rule 23(e)(2), and certify the class for purposes of judgment.  We respectfully request that the Court grant preliminary approval so that notice can be given and Settlement Class Members have the opportunity to exercise their rights under Rule 23 and the terms of the settlement.

We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 10th day of April 2019 at San Francisco, California, and Haverford, Pennsylvania.

By:     */s/Daniel C. Girard*

Daniel C. Girard

By:     */s/ Benjamin F. Johns*

Benjamin F. Johns (*Pro Hac Vice*)

## ATTESTATION STATEMENT

I, Daniel C. Girard, am the ECF User whose identification and password are being used to file this document pursuant to Civil L.R. 5-1(i)(3).  I attest under penalty of perjury that Benjamin F. Johns concurred in this filing.

DATED:  April 10, 2019                              */s/ Daniel C. Girard*

1

## **CERTIFICATE OF SERVICE**

2      I, Daniel C. Girard, certify that on April 10, 2019, I caused the foregoing to be filed using the

3  Court's CM/ECF system, thereby causing it to be served upon all registered ECF users in this case. I

4  also caused a copy of the under seal documents to be served *via electronic mail* on counsel of record for

5  defendants.

6

7                                        */s/ Daniel C. Girard*

8                                        Daniel C. Girard

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT DECLARATION ISO OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL
CASE NO. 5:17-cv-02185-BLF